# United States Court of Appeals
## For the First Circuit

No. 23-1337

UNITED STATES OF AMERICA,

Appellee,

v.

CARL LANGSTON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Montecalvo, Lynch, and Rikelman,
Circuit Judges.

Robert Herrick for appellant.

Benjamin M. Block, Assistant United States Attorney, with whom Darcie N. McElwee, United States Attorney, was on brief, for appellee.

August 2, 2024

**RIKELMAN, Circuit Judge.** Carl Langston appeals his conviction for possessing a gun in violation of 18 U.S.C. § 922(g)(1), the felon-in-possession statute. Langston's primary argument is that this statute is unconstitutional under the Second Amendment as applied to him. In particular, he claims that the government cannot, consistent with the Second Amendment, bar him from ever possessing a gun again based on his previous convictions under Maine law for theft and drug trafficking. Because Langston challenges the constitutionality of § 922(g)(1) for the first time on appeal, we must review his claim under the plain-error standard, which requires that any error be "clear" or "obvious." And, because it is not "clear" or "obvious" that § 922(g)(1) is unconstitutional under the Second Amendment as applied to someone with Langston's criminal history, he cannot prevail under this standard. Langston also challenges the district court's denial of his motion to suppress evidence (including the gun) uncovered during a police stop, as well as several of the district court's sentencing decisions. We agree with the district court's ruling that the police stop was based on reasonable suspicion and find no errors in the court's sentencing decisions. Thus, we affirm Langston's conviction and sentence.

## I. BACKGROUND

Because this appeal follows Langston's guilty plea, we draw the facts relevant to Langston's sentencing from "the

probation office's presentence investigation report (PSR), the plea agreement, . . . the transcript of the sentencing hearing," and the sentencing exhibits. United States v. Colón-Cordero, 91 F.4th 41, 45 (1st Cir. 2024); see also United States v. Ruperto-Rivera, 16 F.4th 1, 3 (1st Cir. 2021). As for the facts relevant to Langston's suppression argument, "[w]e recite [them] as found by the district court," United States v. Werra, 638 F.3d 326, 328 (1st Cir. 2011), and view them "in the light most favorable to the district court's ruling," United States v. Soares, 521 F.3d 117, 118 (1st Cir. 2008) (quoting United States v. Kimball, 25 F.3d 1, 3 (1st Cir. 1994)).

**A. Langston's Arrest at The Bar on February 7, 2021**

Two incidents are critical to this appeal. The first, which gave rise to Langston's conviction, took place at The Bar in Portland, Maine.

Shortly before midnight on February 6, 2021, the Portland Police Department (PPD) received a 911 call about a disturbance at The Bar. An anonymous tipster reported that "a black male wearing a black hat with horns . . . [was] yelling and had punched a white male that had a beard." The injured man reportedly had left, while "the black male was still outside yelling."

The PPD dispatched two officers, Garrick Rogers and Ryan Cannell, to investigate. When they arrived, The Bar was quiet,

and no one matching the description provided by the tipster was present. Rogers and Cannell spoke with a bouncer, who confirmed that a fight had occurred but stated that a "recurrence was unlikely unless the participants encountered each other again somewhere else that night." Satisfied that all was well for the moment, Rogers and Cannell left The Bar.

Soon after, the anonymous tipster placed another 911 call. This time, he identified himself as "Shawn" and gave his address and telephone number. Shawn reported that the man who had "started the fight" was "still in the bar." A few minutes after Shawn's call, The Bar's off-site manager called 911 to convey a report he had received from an on-site security guard. The PPD dispatch then relayed these latest tips over the radio:

> One of the males involved in the fight went to his car and grabbed a 1032 gun. He's now looking for another male that he was fighting with. They said he had a pistol in his coat. Black male, 5'10", maroon jacket with a grey hood. He's currently outside the bar with his hand in his pocket.

Rogers and Cannell, along with a third officer, Zachary Theriault, returned to the scene to investigate.

When Rogers arrived back at The Bar, he saw an individual outside who matched the description from the 911 calls, down to the maroon jacket, grey hood, and black hat decorated with a horns design. That individual turned out to be Carl Langston, although Rogers did not know his name at the time. Langston appeared to be

arguing with another man outside The Bar; from Rogers's perspective, the man appeared to be blocking Langston's entrance into The Bar, and Langston appeared to be pushing against the man, trying to get in.

Rogers approached and told Langston to put his hands on his head. Langston first replied, "Who?" After Rogers repeated his command, Langston retreated slightly and said, "Nah." As he backed away from Rogers, Langston held his right arm close against his right jacket pocket, in a manner that led Rogers to believe that a gun could be located there.

Meanwhile, Theriault approached The Bar from the opposite side, moving in from behind Langston, out of Langston's sight. He observed Langston refusing to comply with Rogers's commands and, because he could not see Langston's hands from behind, worried that Langston might pull a gun out of his jacket, given the information relayed by the PPD that Langston "had a pistol in his coat." After Langston turned around and saw Theriault behind him, Theriault grabbed Langston's right wrist and shoulder to stop him from reaching for a weapon. Langston tried to break the hold and pull away, at which point Rogers entered the fray. Theriault intentionally dropped to the ground, with Langston on top of him, where the three men struggled.

Cannell then arrived on the scene and began assisting Theriault and Rogers in subduing Langston. After about a minute,

the three men successfully gained control of Langston, and Rogers handcuffed him.  Theriault sustained a knee abrasion during the struggle.

Shortly after handcuffing Langston, Theriault and Rogers noticed the grip of a pistol in Langston's right pocket.  They secured the pistol and, after searching Langston, found a loaded magazine.  They then arrested Langston for refusing to submit to arrest or detention in violation of Maine law.  Other state charges against Langston were later added, including felony assault on an officer.  The state eventually dropped those charges in favor of federal prosecution.

**B. Langston's Indictment and Motion to Suppress**

In October 2021, a grand jury indicted Langston with one count of violating the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1), based on his prior felony convictions under Maine law for theft and drug trafficking.  Although the indictment and Langston's PSR contain limited information about the theft offense, it appears that Langston was convicted of violating title 17-A, section 353 of the Maine Criminal Code, which criminalizes theft by unauthorized taking or transfer.  As for the drug offense, Langston was convicted of heroin trafficking in violation of section 1103(1-A)(A) of the Code.

After his indictment, Langston moved to suppress the evidence that the PPD officers had obtained when they tried to

stop him outside The Bar. He argued that the Fourth Amendment to the U.S. Constitution required the suppression of the gun and ammunition because the officers lacked "reasonable suspicion" to perform their investigatory stop of him that night. The district court held an evidentiary hearing, at which Rogers and Theriault testified. It then determined that the totality of the circumstances gave rise to reasonable suspicion that criminal activity was afoot and denied Langston's motion.

Langston then entered into a conditional plea agreement with the government in November 2022. Under that agreement, he retained the right to appeal the court's suppression order.

Before Langston's sentencing, the probation officer submitted a PSR to the district court. In the PSR, the officer calculated Langston's base offense level as fourteen; he then added four levels for possessing a firearm during felony assault on an officer and subtracted three levels for Langston's acceptance of responsibility, for a total offense level of fifteen. Combined with a criminal history category of VI, this yielded a guideline sentencing range (GSR) of forty-one to fifty-one months.

### C. Incident at The Brook Casino During Langston's Pretrial Release

The second incident critical to this appeal took place at The Brook casino in Seabrook, New Hampshire, four months after Langston pleaded guilty and while he was on release pending

sentencing. Langston was playing poker at The Brook when the dealer at his table accidentally exposed a card during the hand. The dealer called over a floor manager, who "followed the correct procedures to fix the mistake." Langston remained upset, however, and the floor manager asked Jason Gigliello, the casino manager, to speak with him.

To address Langston's concerns, Gigliello called the casino's surveillance team, who reviewed the hand and confirmed that the dealer had properly fixed the error. After Gigliello told Langston that "surveillance was conclusive," Langston became "combative and agitated." Gigliello then summoned security, at which point Langston "turned aggressive" and told Gigliello that he would "get[ his] $200 back one way or another." After Langston refused to leave on his own, Gigliello called the police and asked them to remove Langston from the casino. According to Gigliello's report, Langston "appeared intoxicated" and was "unsteady on his feet."

One of the Seabrook police officers who responded to Gigliello's call noted that Langston smelled like alcohol, and "it was clear that he just had too much to drink." After Langston refused to give the officers his full name or hand over his license, they took him into protective custody. They then transported him to the police station, where they found Langston's license and determined that he was on federal probation.

The Seabrook police sent a report on the incident to Langston's probation officer. Based on the police report, the probation officer concluded that Langston had violated his pretrial release conditions, which required him to refrain from drinking and to inform his probation officer about any contact with law enforcement. The probation officer then submitted several revisions to the PSR, suggesting that Langston be denied credit for acceptance of responsibility.

## D. Langston's Sentencing

Shortly after the casino incident, in late March 2023, the district court held Langston's sentencing hearing. At the hearing, Langston told the court that he had no objection to the PSR, which included a recommendation for a four-level offense enhancement based on the state charge that he possessed a gun during an assault on an officer outside The Bar. Langston did object, however, to three exhibits that the government sought to introduce to prove that he violated his pretrial release conditions by drinking at the casino. Specifically, Langston objected to (1) the protective custody report from the Seabrook police, (2) an email from the Director of Casino Operations, indicating that casino staff had served Langston ten drinks (nine alcoholic) and identifying the staff who did so and when, and (3) an email from the casino's Surveillance Director, which included screenshots of staff serving Langston drinks. Langston insisted that these

exhibits were unreliable, claiming that the police report incorrectly recounted the poker-hand incident and the casino emails came from individuals with no personal knowledge of his alleged drinking. The court overruled these objections and concluded that, after reviewing all the evidence, which included surveillance footage of Langston in the police vehicle that night, "there[] [was] no question . . . that [Langston] was inebriated" at the casino.

The district court then addressed whether Langston had accepted responsibility for his offense. After hearing from both sides, the court concluded that Langston was not entitled to the acceptance-of-responsibility credit because of his conduct at the casino while he was on pretrial release (as well as because of an interim incident not at issue in this appeal). The court explained the similarities between Langston's behavior at The Bar and The Brook:

> The initial offense [at The Bar] involved drinking at a bar, not cooperating with police, resisting the police. We had a later event where he was at a different bar, The Lodge, where he got into an argument with a customer and he was restrained by his companion. And then we have this event.
> I find he was intoxicated at the casino. He was drinking in violation of his bail provisions. He was asked to leave multiple times and refused. I base this on the exhibits. The security guard, I note, felt he was drinking; the police smelled alcohol. When the police came he refused to give his full name multiple times, in spite of the fact

that he was on probation and subject to bail conditions.

Multiple times he gave his name as Carl, refused to give his name, acting like a -- he was toying with the police. When the police attempted to take him out, the police described him as aggressively jerking his arm. He continued to refuse to cooperate with the police, and I'm referring back again to the analogy to the earlier offense. He made comments to the casino manager, I believe it was the manager, saying I'm going to get my two dollars back -- $[]200 back one way or another, which to me is a threat. And he didn't report this incident to the probation officer until March 21st. I understand that his position is that the policeman could have reported it, but that was not the -- the bail obligation. It was his obligation to report it, making light of his obligations. I think coupled with the original offense, it appears to me he hasn't learned much. And I find there's no acceptance of responsibility.

Without the acceptance-of-responsibility credit, the district court calculated Langston's total offense level as eighteen. Combined with a criminal history category of VI, this yielded a GSR of fifty-seven to seventy-one months. The court sentenced Langston to fifty-seven months in prison -- the lowest end of this range.

## II. DISCUSSION

As we previewed above, this appeal raises three main issues. First, Langston brings an as-applied Second Amendment challenge to his statute of conviction. Second, Langston claims that the police officers did not have reasonable suspicion to stop him at The Bar. Third, Langston contends that the district court

made several errors at sentencing.  We address each argument in turn and ultimately conclude that none has merit.

### A. Second Amendment Challenge to 18 U.S.C. § 922(g)(1)

Langston's primary argument on appeal is that the felon-in-possession statute, 18 U.S.C. § 922(g)(1), is unconstitutional under the Second Amendment as applied to him. See U.S. Const. amend. II.  In particular, he claims that § 922(g)(1) cannot, consistent with the Second Amendment, prohibit someone with previous convictions under Maine law for theft and drug trafficking from ever owning a firearm again.  In Langston's view, this conclusion should have been clear and obvious to the district court after the government failed to provide any evidence that such a prohibition conforms to our historical tradition of firearm regulation.  In making this argument, Langston relies on New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), which was decided about nine months before his sentencing, as well as the Supreme Court's recent decision in United States v. Rahimi, 144 S. Ct. 1889 (2024).

We begin by reviewing the key legal principles that apply to Langston's constitutional challenge.  The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In a series of decisions, the Supreme Court has determined that this provision

protects the right of an ordinary, law-abiding individual to keep and bear arms.  See Rahimi, 144 S. Ct. at 1897; Bruen, 597 U.S. at 8-9; McDonald v. Chicago, 561 U.S. 742, 750 (2010); District of Columbia v. Heller, 554 U.S. 570, 595 (2008).  And, when the government restricts this right, it bears the burden of justifying the restriction by showing that it is consistent with our history and tradition.  See Rahimi, 144 S. Ct. at 1897; Bruen, 597 U.S. at 24.

The Supreme Court clarified the scope of the history and tradition test under the Second Amendment in Rahimi, which both parties agree provides the governing legal standard that we must apply here.[1]  See Henderson v. United States, 568 U.S. 266, 268-69 (2013) (holding that an error that was not plain at the time the trial court acted may be plain at the time of appellate review based on subsequent legal developments).  In Rahimi, the Court

---

[1] Indeed, in the wake of Rahimi, the Supreme Court granted several pending petitions for certiorari involving Second Amendment challenges to § 922(g)(1) post-Bruen, vacated the decisions below, and remanded to the appellate courts to reanalyze the challenges under Rahimi.  The Court vacated the decisions regardless of whether the decision had upheld or rejected a Second Amendment challenge to § 922(g)(1).  See, e.g., Range v. Att'y Gen. U.S., 69 F.4th 96, 106 (3d. Cir. 2023) (en banc) (finding § 922(g)(1) unconstitutional under Bruen as applied to an individual with a prior felony conviction for food stamp fraud), vacated sub nom. Garland v. Range, No. 23-374, 2024 WL 3259661 (July 2, 2024); United States v. Jackson, 69 F.4th 495, 505-06 (8th Cir. 2023) (reaching the opposite conclusion for individual with prior felony convictions for selling drugs), vacated, No. 23-6170, 2024 WL 3259675 (July 2, 2024).

noted that "some courts ha[d] misunderstood the methodology of [its] recent Second Amendment cases" and explained that "[t]hese precedents were not meant to suggest a law trapped in amber." 144 S. Ct. at 1897. It then held that the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791" and thus does not require a "historical twin" to justify a modern firearm restriction. Id. at 1897-98 (quoting Bruen, 597 U.S. at 30). Instead, the correct constitutional inquiry is whether the restriction is "consistent with the principles that underpin our regulatory tradition," meaning whether it is "'relevantly similar' to laws that our tradition is understood to permit." Id. at 1898 (quoting Bruen, 597 U.S. at 29). "Why and how the regulation burdens the [Second Amendment] right are central to this inquiry." Id.

Applying this framework, the Supreme Court rejected Rahimi's facial constitutional challenge to § 922(g)(8). See id. This statute prohibits an individual from possessing a gun while subject to a domestic violence restraining order if the order includes a finding that the individual poses a "credible threat to the physical safety" of a protected person. 18 U.S.C. § 922(g)(8)(C)(i).

As the Supreme Court explained, Rahimi's facial attack had to fail because the provision was constitutional as applied to his own case. See Rahimi, 144 S. Ct. at 1898. A state court had

issued a restraining order against Rahimi after finding that he posed "a credible threat" to the "physical safety" of his girlfriend and their child.  Id. at 1895.  The government argued that disarming Rahimi was therefore justified because § 922(g)(8)(C)(i) was consistent with the principles behind the surety and going-armed laws of the 1700s and early 1800s, which it identified as relevant analogues.  See id. at 1899-1902.  The Supreme Court agreed.  "Taken together, the surety and going[-]armed laws confirm what common sense suggests," the Court concluded, that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others."  Id. at 1901-02.

Turning back to this case, Langston contends that § 922(g)(1) is unconstitutional under the Second Amendment as applied to him.  Our decision here, however, is not on the merits. Instead, because Langston concedes that he never made his Second Amendment claim to the district court, both parties agree that we must review Langston's claim only for plain error.  See United States v. Sansone, 90 F.4th 1, 6 (1st Cir. 2024) ("Unpreserved claims of error, if not deemed waived, are reviewed only for plain error.").

To prevail under the plain-error standard, Langston must show that (1) the district court committed an error; (2) that error was "plain -- that is to say, clear or obvious," (3) the error

affected his substantial rights, and (4) leaving the error uncorrected would "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." United States v. Ortíz-Mercado, 919 F.3d 686, 689 (1st Cir. 2019) (citations omitted). We need not address the prongs of the plain-error standard in any particular order. See Dimanche v. Mass. Bay Transp. Auth., 893 F.3d 1, 10, 12 (1st Cir. 2018).

We start with the second prong, which requires us to decide whether the error -- if there was one -- was "plain." As we have explained, a plain error must be "indisputable." United States v. Correa-Osorio, 784 F.3d 11, 22 (1st Cir. 2015) (quoting United States v. Jones, 748 F.3d 64, 70 (1st Cir. 2014)). Thus, "[t]o obtain relief from his conviction, . . . [Langston] must show not only that [§ 922(g)(1)'s application to him was unconstitutional] but also that it was obviously so." United States v. Diaz, 285 F.3d 92, 96 (1st Cir. 2002). To demonstrate that the statute was obviously unconstitutional, Langston can point either to binding on-point precedent or show "that [his] theory 'is compelled' by constitutional law, statute, regulation, or other legal mandate." United States v. Grullon, 996 F.3d 21, 33 (1st Cir. 2021) (quoting United States v. Romero, 906 F.3d 196, 207 (1st Cir. 2018)). In the plain-error context, binding on-point precedent means a decision that adopts Langston's argument that § 922(g)(1) is unconstitutional as applied to an individual with

underlying convictions under title 17-A, sections 353 and 1103(1-A)(A) of the Maine Criminal Code.  See Romero, 906 F.3d at 207.

We conclude that Langston fails under the plain-error standard for at least two reasons.  First, there is no binding on-point precedent: No case from the Supreme Court or our court holds that § 922(g)(1) is unconstitutional in any of its applications, much less as applied to an individual with previous convictions under these sections of the Maine Criminal Code.

Second, the legal test from Rahimi does not "compel" the conclusion that § 922(g)(1) is unconstitutional under the Second Amendment as applied to defendants with Langston's criminal history, as charged in his indictment.  To be sure, an error can be plain if an outcome contrary to the district court's decision is "compelled" by "legal mandate."  See Grullon, 996 F.3d at 33 (quoting Romero, 906 F.3d at 207).  Our precedent therefore allows for the possibility that a statute that restricts a constitutional right could be plainly unconstitutional under a newly articulated legal test.  But that is not the case here.

Rather than compelling the conclusion that § 922(g)(1) is unconstitutional, the Supreme Court's Second Amendment cases consistently reiterate, albeit in dicta, the presumptive lawfulness of the felon-in-possession statute.  The Court noted in both Heller and McDonald that "nothing in [its decisions] should

be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." Heller, 554 U.S. at 626-27; see also McDonald, 561 U.S. at 786 (repeating Heller's assurances). Heller referred to felon-in-possession laws as "presumptively lawful regulatory measures." 554 U.S. at 627 n.26. And Bruen incorporated and expanded upon the Court's statements in Heller and McDonald. See Bruen, 597 U.S. at 26, 29; see also id. at 80-81 (Kavanaugh, J., concurring) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." (alteration in original) (quoting Heller, 554 U.S. at 626-27)).

Most importantly, the Supreme Court's majority opinion in Rahimi, joined by eight justices, once again identified prohibitions on the possession of firearms by felons as "presumptively lawful." 144 S. Ct. at 1902 (quoting Heller, 554 U.S. at 627 n.26). Thus, Langston's argument that the legal test laid out in Rahimi compels the conclusion that certain applications of § 922(g)(1) violate the Second Amendment is contradicted by the text of Rahimi itself.

To be sure, Langston presents a serious constitutional claim that the Supreme Court has not yet resolved. As Langston points out, Rahimi held only that an individual may be temporarily disarmed, consistent with the Second Amendment, if a court has found that the individual poses a credible threat to the physical

safety of another.  See id. at 1903.  Still, the Supreme Court has stated repeatedly over sixteen years, from Heller to Rahimi, that felon-in-possession laws are presumptively lawful.  Thus, on plain-error review, we cannot agree with Langston that the mere fact that the government did not introduce historical evidence to support the constitutionality of § 922(g)(1) makes it clear and obvious that Langston's conviction violates the Second Amendment.

At times, Langston has framed his Second Amendment claim as a challenge to § 922(g)(1) as applied to all individuals with nonviolent underlying convictions.  To the extent that Langston is bringing this alternative claim, we conclude that his challenge fails under plain-error review for another reason: It would not have been clear and obvious to the district court that Langston fell within this category of individuals, given his prior conviction for heroin trafficking.[2]  See United States v. Torres-Rosario, 658 F.3d 110, 113 (1st Cir. 2011) (suggesting that drug dealing was likely to be considered a violent felony).

---

[2] We note, too, that Langston has prior convictions for violent criminal conduct.  For example, Langston's criminal history report shows that he was convicted of domestic violence assault in 2008 after punching his girlfriend in the face and grabbing her by her throat.  Although the government did not include this conviction as an underlying offense in the indictment, it indicated at oral argument that it would have sought to file a superseding indictment relying on this conviction had Langston raised his Second Amendment argument at the district court.

In sum, Langston fails to show that § 922(g)(1) clearly and obviously violates the Second Amendment as applied to him, given his previous convictions under Maine law for theft and drug trafficking.  We therefore reject his Second Amendment challenge.[3]

**B. Fourth Amendment Challenge to the Investigatory Stop**

When Langston pleaded guilty, he retained the right to appeal the district court's denial of his suppression motion.  We turn to that challenge now.

Langston argues that the PPD officers violated the Fourth Amendment by stopping him outside The Bar.  See U.S. Const. amend. IV; United States v. Tiru-Plaza, 766 F.3d 111, 115 (1st Cir. 2014) (explaining that the Fourth Amendment's protections

---

[3] Although we always conduct our own independent analysis of Supreme Court precedent, the parties could not cite to any case from another circuit court that has held the felon-in-possession statute to violate the Second Amendment, in any of its applications, under the plain-error standard.

The only circuit to reach the merits of an unpreserved constitutional challenge to § 922(g)(1) did so under distinguishable circumstances, and the opinion has been vacated in the wake of Rahimi.  See United States v. Duarte, 101 F.4th 657, 663 (9th Cir.), reh'g en banc granted, opinion vacated, No. 22-50048, 2024 WL 3443151 (9th Cir. July 17, 2024).  In Duarte, the United States Court of Appeals for the Ninth Circuit reviewed de novo the statute's constitutionality under Bruen, even though the defendant had not raised his Second Amendment argument to the district court.  See id. at 663.  The court concluded that the defendant had "good cause" under Federal Rule of Criminal Procedure 12(b)(4)(B)(c)(1) for failing to raise the issue in the district court because circuit precedent foreclosed the argument and Bruen had not yet been decided.  See id.  By contrast, as we noted above, Bruen was decided nine months before Langston's sentencing, so he had the opportunity to raise his argument to the district court.

against unreasonable search and seizure extend to "brief investigatory stops" that fall "short of traditional arrest" (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002))). For a stop like this to be constitutional under the Fourth Amendment, officers must have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" Tiru-Plaza, 766 F.3d at 115 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). Langston claims that the district court erred by determining that the officers had that reasonable suspicion here.

The district court's reasonable suspicion determination is a legal conclusion that we review de novo. Id. But in doing so, we "give appropriate weight to the inferences drawn by the district court and the on-scene officers, recognizing that they possess the advantage of immediacy and familiarity with the witnesses and events." Id.

After holding an evidentiary hearing, the district court rejected Langston's Fourth Amendment challenge in a carefully reasoned opinion. It determined that the officers acted with reasonable suspicion based on three sources of information: "(1) the various accounts received from the three informants; (2) [the officers'] own observations of [Langston's] appearance and behavior immediately preceding the stop; and (3) their law

enforcement training and experience, which included their experience policing" this neighborhood.

On appeal, Langston focuses on this first category: the accounts from the various informants. He argues that the district court erred by considering both 911 calls by Shawn, as well as the information conveyed by the bar bouncer and the bar manager, in its reasonable suspicion analysis. Instead, Langston argues, only two accounts are relevant here: Shawn's second 911 call, and the off-site bar manager's "third-hand" report from his on-site security guard that a patron had a concealed gun. That's because, in Langston's view, there were two separate incidents at The Bar that night, and the police officers and the court should not have considered information related to the earlier incident (the fight) in evaluating whether Langston's stop was reasonable.

Viewing the record in this piecemeal fashion would violate our precedent. When evaluating whether reasonable suspicion exists, "our task is not to perform a divide-and-conquer analysis but to look at the totality of the circumstances." United States v. Harrington, 56 F.4th 195, 202 (1st Cir. 2022) (internal quotation marks omitted) (quoting United States v. Cruz-Rivera, 14 F.4th 32, 45 (1st Cir. 2021)). "[T]he relevant inquiry is an objective one based on all 'the cumulative information available to [the officers]' at the time of the search [or stop]." United States v. Qin, 57 F.4th 343, 349 n.7 (1st Cir. 2023) (quoting

Arvizu, 534 U.S. at 273).  Indeed, Langston admits that the totality-of-the-circumstances standard applies.  And he could not point to any case law suggesting that, in conducting a totality-of-the-circumstances analysis, we should disregard relevant information known to the officers simply because they already conducted some initial investigation of that information.

Langston also argues that the bar manager's 911 call, which conveyed "third-hand" information from an unknown source, cannot on its own give rise to a reasonable suspicion of criminal activity.  In fact, Langston argues, that tip did not even indicate that he was engaged in any criminal behavior, given that carrying a concealed gun is not a crime in Maine.  This argument, however, again misstates the legal standard.  True, an anonymous, uncorroborated hearsay tip, on its own, may lack "sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop."  Florida v. J.L., 529 U.S. 266, 270 (2000) (quoting Alabama v. White, 496 U.S. 325, 327 (1990)); see United States v. Monteiro, 447 F.3d 39, 44-45 (1st Cir. 2006).  But the police did not act on the bar manager's tip alone.  The full picture here included Shawn's two 911 calls, the officers' conversation with the bar bouncer (which validated the details from Shawn's first 911 call), the bar manager's call, and the officers' observations at the scene.

Considering these informational sources together, we conclude that the totality of the circumstances gave rise to a reasonable suspicion that Langston was about to engage in criminal activity -- public fighting, potentially with a gun on hand. Shawn's first 911 call, combined with the officers' conversation with the bar bouncer, suggested that a fight had occurred, and further trouble was likely if the parties encountered each other again that night. Shawn's second call, combined with the bar manager's account, suggested that a second fight was imminent because one of those parties had returned to The Bar with a weapon. And when the police arrived on the scene, their observations of Langston's interactions with another person outside The Bar and Langston's appearance, which matched the informants' descriptions, corroborated these accounts. Based on these circumstances, we agree with the district court that that the officers had reasonable suspicion to stop Langston outside The Bar that night.

## C. Sentencing Challenges

Langston's remaining challenges concern the district court's sentencing decisions. To begin, he argues that the district court erred by enhancing his base offense level on the ground that he possessed a firearm during a felony assault on a police officer. Next, he contends that the district court considered unreliable hearsay evidence in concluding that he violated the conditions of his pretrial release by drinking.

Finally, and by extension, Langston argues that the district court clearly erred by finding that he had not accepted responsibility for his offense. We disagree on each of these points.

## 1. The Felony Assault Enhancement

We begin with Langston's challenge to the district court's four-level sentencing enhancement under section 2K2.1(b)(6)(B) of the U.S. Sentencing Guidelines. This provision allows a district court to increase a defendant's base offense level "[i]f the defendant . . . used or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). The district court applied the enhancement based on Langston's possession of the firearm during an assault on a police officer -- a felony under Maine law. See Me. Rev. Stat. Ann. tit. 17-A, § 752-A.

Ordinarily, "[when] a defendant challenges the factual predicate supporting the district court's application of a sentencing enhancement, 'we ask only whether the court clearly erred in finding that the government proved the disputed fact by a preponderance of the evidence.'" United States v. Cannon, 589 F.3d 514, 517 (1st Cir. 2009) (quoting United States v. Luciano, 414 F.3d 174, 180 (1st Cir. 2005)). Langston concedes, however, that he did not object to the enhancement before the district court and thus forfeited this claim. Still, he urges us to find that the district court plainly erred by applying this enhancement.

The government, for its part, argues that we should forgo review of this argument altogether because Langston affirmatively waived it when he told the district court that he had no objection to the PSR, which recommended the four-level increase.

We need not resolve the parties' forfeiture versus waiver disagreement. "Where a defendant's claim would fail even if reviewed for plain error, we have often declined to decide whether the defendant's failure to raise the issue below constituted waiver or mere forfeiture." United States v. Acevedo-Sueros, 826 F.3d 21, 24 (1st Cir. 2016). And here, Langston has failed to show that the district court's application of the enhancement amounted to plain error.

Langston contends that the district court erred by applying the enhancement because his conduct at The Bar could support only a misdemeanor charge for refusing to submit to arrest or detention under Maine law. In support of this argument, Langston points to two facts: Initially, he was arrested only for refusing to submit to arrest or detention, and the altercation with the officers occurred because he tried to get away from, rather than fight with, them.

Even assuming Langston is correct on both these facts, the district court's application of the enhancement still would not be clearly and obviously wrong. See Ortíz-Mercado, 919 F.3d at 689. Under Maine law, an individual can be liable for assault

on an officer regardless of whether they are trying to engage or disengage with the officer. See Me. Rev. Stat. Ann. tit. 17-A, § 752-A(1)(A) ("A person is guilty of assault on an officer if . . . [h]e intentionally, knowingly or recklessly causes bodily injury to a law enforcement officer while the officer is in the performance of his official duties."). And whatever the basis for his initial arrest at The Bar, Langston's PSR shows that the state did charge him with assault on an officer in connection with this incident. Accordingly, we reject Langston's argument that the district court plainly erred by applying the enhancement.

## 2. Reliability of Hearsay Evidence

We turn next to Langston's challenge to the district court's reliance on several government exhibits in concluding that Langston violated his pretrial release conditions by drinking at The Brook casino. Langston contends that the district court erred by admitting three hearsay exhibits: the protective custody report from the Seabrook police and two emails from casino managers forwarding information from casino records about what drinks Langston was served that night. Langston argues that these exhibits lacked sufficient indicia of trustworthiness to support their probable accuracy and thus the district court abused its discretion by relying on them to conclude that Langston consumed alcohol at the casino. See United States v. Rosa-Borges, 101 F.4th 66, 80 (1st Cir. 2024) (explaining that district courts may rely

on hearsay evidence in making factual findings at sentencing, so long as the evidence is supported by "sufficient indicia of reliability"); United States v. Castillo-Torres, 8 F.4th 68, 71 (1st Cir. 2021) ("Determinations of reliability are reviewed for abuse of discretion.").

Langston's arguments boil down to two claims: (1) the police report got the facts wrong about the poker-hand dispute, which undermines everything in the report, including the officer's personal observation that Langston was intoxicated,[4] and (2) the emails from the casino managers are unreliable because the managers had no personal knowledge of whether the drinks served to Langston contained alcohol. We find neither claim convincing.

First, we see no reason why the officer's allegedly erroneous description of the poker-hand dispute would undermine the reliability of other statements in his report, including that the officer could "smell the alcohol coming from [Langston's] person" and that "it was clear that he just had too much to drink."

---

[4] Langston also argues that the report is unreliable because it "depicts a patent misuse of the New Hampshire protective custody [statute]." He contends that the officer's observation that Langston smelled like alcohol was insufficient to take him into custody. But the relevant statute allows an officer to take into protective custody any person "who, in the judgment of the officer, is intoxicated." N.H. Rev. Stat. Ann. § 172-B:3(I). We see nothing in the statute, nor does Langston direct us to any authority, that suggests that an officer must observe certain other indicia of intoxication before taking a person into protective custody. Nor do we see the connection between this argument and the reliability of the officer's observations in the report.

The officer's understanding of the poker-hand dispute does not bear on his ability to make these routine observations. Second, the casino's business records -- documenting that Langston consumed alcohol -- are "entirely compatible" with and corroborated by other admissible evidence in the record. See United States v. Green, 426 F.3d 64, 67 (1st Cir. 2005). That other evidence includes Gigliello's email, which recounted that Langston "appeared intoxicated" and was "unsteady on his feet," and surveillance footage from the police cruiser, in which Langston can be seen singing and slurring his speech.

Indeed, as the district court explained at sentencing, it had reviewed the surveillance footage of Langston's behavior in the back of the police cruiser and compared that behavior to its own observations of Langston during his previous court appearances. Langston "acted so different [in the back of the cruiser] than he ha[d] any other time," the court noted, adding: "He was singing to himself, he was groggy, his voice sounded inebriated." Based on this video, the court concluded, "there's no question . . . that he was inebriated."

Under these circumstances, we find that the district court did not abuse its discretion by admitting the police report and casino records as more evidence that Langston had consumed alcohol at The Brook.

### 3. Acceptance-of-Responsibility Credit

In his last argument on appeal, Langston challenges the district court's decision to deny him a three-level reduction for accepting responsibility for his offense. Langston argues that, even if he did violate his bail conditions, the violations were too "attenuated" from his underlying offense to justify denial of the acceptance-of-responsibility credit.

Under the Sentencing Guidelines, a defendant who "clearly demonstrates acceptance of responsibility" is entitled to a two-level decrease in their offense level. U.S.S.G. § 3E1.1(a). A defendant who qualifies for this two-level decrease may also obtain another one-level decrease if they "timely notify[] authorities of [their] intention to enter a plea of guilty," among other requirements. Id. § 3E1.1(b).

Whether a defendant has accepted responsibility for their offense is a "factbound determination" that we review for clear error. United States v. McCarthy, 32 F.4th 59, 62-63 (1st Cir. 2022) (quoting United States v. Jordan, 549 F.3d 57, 60 (1st Cir. 2008)). Because "[t]he sentencing court is steeped in the nuances of the case, . . . we accord substantial deference to its determination that acceptance of responsibility has not been shown." Id. at 63. For this reason, "[w]e will not reverse unless -- after a careful review of all the relevant facts -- we are 'left with a definite and firm conviction that a mistake has

been committed.'" Id. (quoting Brown v. Plata, 563 U.S. 493, 513 (2011)).

The district court denied Langston the acceptance-of-responsibility credit based in part on his violation of his pretrial release conditions. Under our precedent, "a defendant's failure to comply with conditions of a bond [can] be highly relevant to assessing the sincerity of the defendant's contrition." United States v. McLaughlin, 378 F.3d 35, 40 (1st Cir. 2004) (alteration in original) (quoting United States v. Hooten, 942 F.2d 878, 883 (5th Cir. 1991)). Langston tries to distinguish this precedent by arguing that the defendant in Hooten breached the "core conditions" of his pretrial release while Langston's "putative violation was isolated and technical in nature." But the court did not deny Langston the credit simply because he consumed alcohol or failed to notify his probation officer about the incident at the casino.

Instead, the district court based its decision on the overall similarities between the incidents at The Bar and The Brook. As the court explained, both times, Langston became disruptive and then non-cooperative with police after drinking. At The Bar, he engaged in a fight, and at The Brook, he became verbally combative and "was asked to leave multiple times and refused." Each time, when police officers arrived on the scene, Langston refused to comply with their instructions. At The Bar,

Langston did "not cooperat[e] with" and "resist[ed]" the police officers when they told him to put his hands on his head. Similarly, at The Brook, Langston "refuse[d] to cooperate with the police" by declining to identify himself. We cannot say that the court clearly erred by finding that these similarities demonstrated that Langston had not "accepted responsibility in any authentic sense" for his conduct at The Bar. Jordan, 549 F.3d at 61.

We also reject Langston's argument that the district court "struck the wrong balance," id. at 62, by finding that the casino incident outweighed Langston's evidence of acceptance of responsibility, i.e., his guilty plea, see McLaughlin, 378 F.3d at 40. Whether a "single adverse incident" outweighs a defendant's "rehabilitative efforts" is a "quintessential judgment call" for the sentencing court. Jordan, 549 F.3d at 62. Nothing in the record suggests that the court clearly erred in balancing the scales here, especially given that it cited an additional adverse incident (not at issue in the appeal) in reaching its conclusion.

## III. CONCLUSION

For all these reasons, we **affirm** Langston's conviction and sentence.